**Malcolm KYSOR, Appellant,**

v.

**James PRICE, Superintendent.**

No. 02–1016.

United States Court of Appeals,
Third Circuit.

Argued Nov. 20, 2002.

Decided Dec. 19, 2002.

Thomas Livingston, Pittsburgh, PA, for Appellant.

Robert H. Sambroak, Jr., Assistant District Attorney, Erie County Courthouse, Erie, Pennsylvania, for Appellees.

Before BARRY, AMBRO, Circuit Judges, and ACKERMAN,* District Judge.

* The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

## OPINION

ACKERMAN, District Judge.

On September 10, 1987, Petitioner Malcolm Kysor was convicted of the first degree murder of Barney Fenton in the Court of Common Pleas of Erie County, Pennsylvania. Kysor received a sentence of life imprisonment. After exhausting his state court remedies, Kysor filed a Petition for Writ of Habeas Corpus in the United States District Court for the Western District of Pennsylvania. On November 27, 2001, the District Court denied Kysor's writ, but granted a certificate of appealability on the issue of whether Kysor received ineffective assistance of counsel at his trial. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253 and 2254.

## I. *Background*

Because we write only for the parties, we need only briefly recite the facts of the case. On May 26, 1981, Barney Fenton picked up Kysor, a hitch-hiker, in Fenton's automobile. They eventually decided to have a homosexual encounter, and drove to a secluded wooded area. According to Kysor, a few minutes after the sexual encounter began, Fenton was unable to maintain an erection, and thrust a flashlight into Kysor's rectum, yelling "I know what you faggots like." Fenton then ran to the trunk and retrieved a golf club. Kysor followed Fenton to the rear of the car, and Fenton swung the golf club at Kysor. Kysor then wrestled the golf club away from Fenton, and repeatedly beat Fenton on the head with the club, fatally wounding him. After killing Fenton, Ky-

sor buried him in a shallow grave in the wooded area, and drove off with Fenton's car.

On July 31, 1982, Fenton's remains were discovered, and the following month Kysor was charged with Fenton's murder. In September, 1982, Dennis Kuftic was appointed as trial counsel for Kysor. Kuftic arranged for psychologist Dr. Frank Pizzat, Ph.D. to interview Kysor. Pizzat met with Kysor on November 20 and 21, and prepared a two-page report which contained the following conclusions:

> There were no distortions in the formal thought processes suggestive of the presence of psychosis even though his thinking sometimes became a bit vague ... The personality tests suggest that the client is seriously disturbed ... such disturbance is not of psychotic proportions, but could become so if stress were unremitting ... Findings further suggest that he is ... one who can behave impulsively, one who can demonstrate a measure of explosivity.

Appendix of Petitioner (hereinafter "App."), Ex. A, at 1–2. During this interview, Kysor did not discuss the sexual abuse he had endured from his uncle as a child, nor his juvenile involvement in homosexual encounters with other partners.

One month before Kysor's trial was scheduled to begin, Kysor met with William Weichler, an attorney assisting Mr. Kuftic. During this meeting, Kysor admitted to the killing of Fenton as described above. Kysor also disclosed that he had been repeatedly sexually abused by his uncle as a juvenile,[1] and discussed the physical similarities between his uncle and

---

1. According to the report of Dr. Lawson Bernstein, M.D., Kysor was forcibly restrained and raped by his uncle in a trailer behind the house where his family lived, and was also forced to have sexual contact with his cousin and a male friend of his uncle. This abuse involved being physically restrained, beaten, anally raped, forced to perform oral sex, and threatened if he reported these events. This activity began when Kysor was 7 years old and continued until Kysor's "late adolescent years." App. Ex. B.

Fenton. This meeting was the first time Kysor had disclosed any of these facts to his attorneys.

Kuftic discussed these revelations with Dr. Pizzat, who indicated that psychiatric testimony to bolster Kysor's defense would be minimally helpful, notwithstanding the new information. In light of this advice, Kuftic did not arrange to have Kysor reexamined, and proceeded to trial with a self-defense theory.

At trial, Kysor testified in his own defense, and admitted that he had killed Mr. Fenton. Kysor also testified about his history of childhood homosexual abuse and the physical description of his uncle; however, this testimony was used for the limited purpose of demonstrating that Kysor was a bisexual man who would be attracted to a person fitting Fenton's physical description. At the close of the trial, Kuftic abandoned the self-defense theory and instead urged the jury to return a verdict of voluntary manslaughter rather than murder.

Kuftic did not introduce any psychiatric evidence at trial. During Kysor's state post-conviction hearing, Kuftic explained that he had rejected the insanity defense because, in his judgment, it was a bad defense that rarely works, and he lacked evidentiary support for such a defense based upon Dr. Pizzat's report. Moreover, Kuftic felt that the psychologist's report, which described Kysor as impulsive and explosive, could impeach Kysor's credibility and undermine the self-defense argument.

The Commonwealth advanced the theory at trial that Kysor killed Fenton in order to rob him of his car and cash. The examining coroner testified that the victim had died of multiple skull fractures consistent with receiving at least eight blows to the head prior to death. The jury convicted Kysor of first degree murder. Kysor received life imprisonment, the minimum possible sentence for this crime.

In 1995, Dr. Lawson Bernstein diagnosed Kysor as suffering from severe post-traumatic stress disorder ("PTSD"). In January, 1996, Kysor filed for state post-conviction relief, arguing that his original counsel was ineffective by failing to urge Dr. Pizzat to re-examine Kysor following his revelations to Weichler. Kysor argues, in effect, that had such a re-examination taken place, Dr. Pizzat would have discovered the PTSD, which would then have been introduced at trial and reduced or eliminated Kysor's culpability. The state court held an evidentiary hearing, and denied Kysor's motion. Kysor appealed to the Pennsylvania Superior and Supreme Courts, and both courts again denied his appeal. Kysor then filed a habeas petition pursuant to 28 U.S.C. § 2254 with the District Court.

## II. Discussion

The analysis of Kysor's ineffectiveness claims is governed by the Supreme Court's clearly established precedent of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To successfully present a claim for ineffective assistance of counsel under *Strickland*, Kysor must first establish that counsel's performance was deficient. Kysor must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed defendant by the Sixth Amendment," and that "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." *Id.* at 687, 688. Second, Kysor must show that he was prejudiced by counsel's errors. *Strickland*, 466 U.S. at 693. Kysor must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id.* at 694.

In *Strickland,* the Supreme Court stated that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. "Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a defendant must overcome the 'presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002) (quoting *Strickland,* 466 U.S. at 689) (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 165, 100 L.Ed. 83 (1955)); *see also Marshall v. Hendricks,* 307 F.3d 36, 105–07 (3d Cir.2002) ("[t]he United States Supreme Court has counseled that in order to assess counsel's performance objectively, reviewing courts must resist the temptation of hindsight, instead determining whether, given the specific factual setting, and counsel's perspective at the time, his strategic choices were objectively unreasonable.").

The fact that our ineffective assistance analysis occurs in the context of a habeas opinion further conscripts our latitude. A petitioner like Kysor "must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly ... Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell,* 122 S.Ct. at 1852.

### A. *Deficient Performance*

■ Kysor argues that Kuftic should have insisted, over Dr. Pizzat's objections, that Dr. Pizzat re-examine Kysor.[2] Moreover, Kysor argues that Kuftic was ineffective for failing to introduce psychiatric evidence to show that Kysor was suffering from PTSD, and that the effects of this condition made it impossible for Kysor to form the requisite *mens rea* to commit first degree murder.

Kysor cites two cases from this circuit in support of his argument, both of which are distinguishable from this case.[3] In *United States v. Kauffman,* 109 F.3d 186 (3d Cir. 1997), a psychiatrist who examined the

---

**2.** Kysor, does not, however, argue that Kuftic should have consulted a doctor other than Dr. Pizzat.

**3.** Although not discussed by respondent or the court below, there is another important issue which this court must take into consideration in evaluating Kysor's claim. Because Kysor brings this action through a habeas petition pursuant to 28 U.S.C. § 2254, we must examine Kysor's claim using the standard of review which Congress articulated in that statute. Specifically, in determining whether a claim adjudicated in state court resulted in a decision that involved an unreasonable application of federal law, this court may look only to principles established by Supreme Court

precedent, and not those established by lower appellate courts. *See Williams v. Taylor,* 529 U.S. 362, 381, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[i]f [the Supreme Court] has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA."). Nevertheless, this court need not consider whether the lower federal court cases cited by Kysor have established a new principle, rather than merely applying a principle established by the Supreme Court, because, as discussed above, Kysor's claims are unavailing even under the precedent of this circuit.

defendant prior to trial issued a report stating that the defendant "was undoubtedly psychotic" at the time the crime was committed. 109 F.3d at 187. Despite the explicit exculpatory language in this letter, however, the trial attorney declined to investigate further the possibility of an insanity defense, and instead advised the defendant to plead guilty. The court held that under these circumstances "we can imagine no reasonable professional calculation which would support [the attorney's] failure to conduct *any* pre-trial investigation into the facts and law of an insanity defense under the circumstances of this case." 109 F.3d at 190 (emphasis in original). The court therefore held that the attorney's performance fell below an objective standard of reasonableness and thus the defendant satisfied the first prong of *Strickland.*

Kysor next cites the case of *United States v. Gray,* 878 F.2d 702 (3d Cir.1989). In that case, there were a number of witnesses available whose testimony could have cleared the defendant of the crime. The attorney in the case, however, failed to subpoena two such witnesses suggested by his client, and made no attempt to hire an investigator to search for any other witnesses. In holding that the defendant received ineffective assistance of counsel, the court reasoned that "counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Id.* at 711.

Both *Kauffman* and *Gray* are inapposite to this case. Whereas the attorneys in *Gray* and *Kauffman* failed to investigate the relevant facts which could have exculpated their respective clients, attorney Kuftic did conduct an investigation of the insanity defense. Kuftic made his strategic decision only after Dr. Pizzat informed him that, in Pizzat's judgment, Kysor's childhood sexual abuse and the similarities between Fenton and Kysor's uncle would not be helpful in mounting an insanity defense. As such, Kuftic's decision was a strategic choice based on a reasonable investigation.

Kysor also argues that Kuftic's act of conferring with Dr. Pizzat was inadequate to protect Kysor's right to effective assistance of counsel. In support of this argument, Kysor cites a letter from Dr. Lawson Bernstein, stating that there is "a fundamental professional requirement that a psychiatrist or psychologist examine or re-examine a patient before ... diagnosing or rendering an opinion about a patient's condition." App. Ex. H. Even assuming the truth if Dr. Bernstein's opinion, Mr. Kuftic's determination that a psychiatric defense would not be viable, irrespective of what diagnosis a re-examination may have turned up, entailed a complex calculus whose undertaking simply cannot be dismissed as constitutionally deficient. For one thing, Mr. Kuftic realized that along with the possibility of an acquittal if the psychiatric defense was successful came the alternative possibility that the admission of all of the psychiatric evidence, including Dr. Pazzat's previous report, would belie Mr. Kuftic's desired portrayal of Kysor at trial and undermine his chances of a verdict of self defense or voluntary manslaughter. Against the backdrop of Kysor's psychiatric record in its entirety, Mr. Kuftic's eschewing a psychiatric defense, with or without a re-examination, and especially in light of Dr. Pizzat's advice not to proceed, can hardly be called unreasonable, much less constitutionally deficient.

### B. *Prejudice*

■ As noted above, even if Kysor could demonstrate deficiency of performance, he

must also satisfy the second prong of the *Strickland* standard: "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. In this case, Kysor must demonstrate a reasonable probability that but for the error, the jury would have acquitted him of first degree murder. Kysor argues that if Dr. Pizzat had re–examined Kysor his revelations concerning his past sexual abuse, Dr. Pizzat would then have diagnosed Kysor's PTSD and testified that the disorder prevented Kysor from forming the requisite *mens rea* to commit first degree murder at the time of the crime.

While Dr. Bernstein clearly would have testified to this effect, the relevant question here is whether Dr. Pizzat would have done so. Dr. Pizzat had already examined Kysor for two days. When Kuftic later informed Pizzat of Kysor's history of juvenile sexual abuse, Pizzat responded that an insanity defense was not viable, and did not request to examine Kysor further. Under these circumstances, we cannot say that there is a reasonable probability that Dr. Pizzat's professional opinion would have been altered by an additional examination of Kysor. Thus, even if Kuftic had insisted that Dr. Pizzat re-examine Kysor, the jury would likely have been presented with the same evidence at trial as Kuftic presented. Moreover, Pizzat's damning earlier descriptions of Kysor as "impulsive" and "explosive" would most likely have prevented Kysor, who Kuftic believed would be a very good witness, from testifying. Kysor has therefore failed to meet the second prong of *Strickland*.

### III. *Conclusion*

For the foregoing reasons, we find that the District Court properly denied Kysor's request for habeas corpus relief pursuant to 28 U.S.C. § 2254. We will affirm the judgment of the District Court.